***********
Upon review of all of the competent evidence of record with references to the errors assigned and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission MODIFIES and AFFIRMS the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. All parties are properly before the Commission and the Commission has jurisdiction of the parties and of the subject matter.
2. A compensable injury occurred on March 17, 2000 to plaintiff's left upper extremity, resulting in radiculopathy down his left arm. Pursuant to a Form 60 defendant paid plaintiff temporary total disability compensation from March 31, 2000 to August 2, 2000 and temporary partial disability compensation from August 3, 2000 through September 30, 2000.
4. The compensation rate is $307.91, based on an average weekly wage of $461.80.
5. Documents stipulated into evidence include the following:
a. Stipulated Exhibit #1: Plaintiff's medical records
b. Stipulated Exhibit #2: Industrial Commission forms
c. Stipulated Exhibit #3: Plaintiff's and Defendant's Answers to Discovery
d. Stipulated Exhibit #4: Job description of approved job after plaintiff returned to work.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 52 years old with a twelfth grade education. He had worked for defendant-employer since June 1999 in a job that required him to lift up to 150 pounds. Plaintiff's work history is predominantly medium to heavy work.
2. On March 17, 2000, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer. Plaintiff was injured when he was lifting clutches weighing approximately 150 pounds. He felt immediate pain in his neck and left arm.
3. Plaintiff was first treated for his injuries at Research Triangle Occupational Health Services on March 20, 2000 and was diagnosed with left rotator cuff sprain. Dr. Aaron Miller limited his return to work to no lifting over 15 pounds and no overhead work, with no repetitive use of his left arm.
4. At the March 24, 2000 visit, plaintiff reported to Dr. Miller that he was being asked at work to lift as much as 50 pounds with his left arm despite the restrictions. At that time his doctor lowered the weight limit to 10 pounds.
5. On March 28, 2000 plaintiff reported to Dr. Miller that while defendant-employer had told him he should take it easy, he was still expected to lift over 50 pounds and was also required to stock shelves overhead. Dr. Miller told plaintiff to stay within his restrictions and referred him to Triangle Orthopaedics.
6. Plaintiff was seen by Kevin Lavery, PA-C for Dr. Kyle E. Black, at Triangle Orthopaedic Associates on March 30, 2000. Plaintiff was diagnosed with cervical degenerative disc disease with radiculopathy. He was given a work note with restrictions of no lifting or carrying with the left arm. He was to lift only ten pounds with his right arm, and overall his work was to be sedentary.
7. Due to plaintiff's failure to improve, he was taken out of work on April 13, 2000 by Triangle Orthopaedics for two weeks in order to have an MRI performed. The MRI results revealed a cervical disc herniation at C5-6, cervical degenerative disc disease and spinal stenosis.
8. Dr. Kyle Black saw plaintiff on May 11, 2000 and indicated that plaintiff could return to work on May 25, 2000 with a ten-pound lifting restriction.
9. Dr. Raphael Orenstein, who is board certified in physical medicine and rehabilitation, treated plaintiff in July 2000. Dr. Orenstein approved the job description for the position plaintiff held prior to his injury, but eliminated duties involving lifting over 15 pounds, repetitive bending or stooping. On August 3, 2000 plaintiff returned to light duty for two weeks and then to full duty.
10. When plaintiff initially returned to work in August 2000, another worker helped him with objects that were too heavy for him to lift alone. As time went on, the employee who assisted plaintiff left the area, and plaintiff was then expected to perform the full duties of his position, including heavy lifting. Plaintiff experienced almost constant numbness and tingling as a result of the job duties.
11. On or about November 3, 2000, plaintiff asked Travis Whitby, parts manager for defendant-employer, about the possibility of changing to a delivery job which would involve less lifting. Plaintiff told Mr. Whitby that he was having difficulty climbing stairs and that he needed help in the warehouse. Mr. Whitby responded that no delivery job was available and that plaintiff would no longer be afforded assistance with his job's lifting requirements.
12. Plaintiff left the employment with defendant-employer on November 3, 2000. Plaintiff was experiencing pain and discomfort from the lifting requirements of his regular job duties. Plaintiff felt that he could not continue to work for defendant-employer because he was jeopardizing his health and did not want the lifting to cause further damage. Defendant-employer did not offer plaintiff a suitable position within his physical limitations and therefore plaintiff did not unjustifiably refuse suitable employment.
13. After leaving the employment, plaintiff received unemployment benefits from December 10, 2000 until June 10, 2001. During this period of time plaintiff was capable of some work and made a reasonable job search but was unsuccessful in obtaining a job. Plaintiff sought no medical treatment from November 2000 until July 31, 2001 when he was last treated by Dr. Orenstein. Plaintiff testified that he did not seek medical care because of his finances, but the evidence does not show that plaintiff sought payment by defendant for any treatment during this time.
14. In his deposition Dr. Orenstein confirmed that plaintiff could have aggravated his condition if he continued to do the work assigned to him by defendant-employer. Dr. Orenstein further indicated that, based on his examination on July 31, 2001, if plaintiff returned to work, his restrictions were no sitting greater than two hours without change of position; no repetitive neck flexion, extension or rotation; no lifting over 50 pounds; and no repetitive bending.
15. Dr. Orenstein believed that plaintiff's pain and pathology resulted from the March 17, 2000 incident which either caused a herniated disc or exacerbated a pre-existing condition. Dr. Orenstein could not with any certainty relate plaintiff's right arm pain to the March 17, 2000 incident.
16. Dr. Orenstein further indicated that the job duties assigned to plaintiff in November of 2000 were not suitable for plaintiff, but he suggested that plaintiff should have returned to his office for follow-up if he experienced problems performing his job. Dr. Orenstein assigned a 15% permanent partial impairment rating to plaintiff's spine, which included his left arm pain.
17. Plaintiff saw Dr. Paul Suh, a board certified orthopedic surgeon with a specialty in adult spine disorders, for a second opinion on August 16, 2001. Dr. Suh diagnosed cervical degenerative disc disease and cervical stenosis and recommended restrictions of no sitting greater than two hours without change of positions, limited neck motion, and no lifting above 50 pounds.
18. Dr. Suh agreed with the previously assigned rating of 15% permanent partial impairment and stated that plaintiff could not return to the heavy work required by his warehouse job. He further indicated that surgery might address plaintiff's left arm pain, but that it was doubtful that it would be beneficial for his neck or right arm pain. Dr. Suh had no explanation for plaintiff's right arm pain.
19. Dr. Suh stated that the March 17, 2000 incident likely exacerbated a pre-existing cervical condition. He further recommended that plaintiff avoid repetitive bending, twisting, overhead activity, and lifting in excess of 75-100 pounds. Dr. Suh agreed that plaintiff's job duties were beyond and in excess of his restrictions, and that plaintiff should follow his work restrictions and not continue in the job with defendant-employer. Dr. Suh believed that plaintiff was employable within the permanent work restrictions, but that retraining was necessary.
20. Dr. Ronald Easley, who is board certified in internal medicine and endocrinology, first saw plaintiff on September 6, 2001. Plaintiff gave a consistent history of the injury by accident. Dr. Easley felt that plaintiff had reached maximum medical improvement and assigned a permanent partial impairment rating of 25%, which included 15% for the herniated disc and 10% for the spinal stenosis.
21. Dr. Easley believed that plaintiff could not perform his regular job during the time frame from May 2000 through the time he left work in November 2000. Had Dr. Easley been treating plaintiff at the time, he would have limited his work to a 15-pound lifting restriction. In Dr. Easley's opinion, plaintiff cannot return to his previous employment, but could return to work with some lifting restrictions.
22. Dr. Easley further stated his opinion and the Full Commission finds that plaintiff's work-related injury either caused or exacerbated the spinal stenosis. Dr. Easley also felt that plaintiff may require surgery due to his compensable injury.
23. As of the date of the Deputy Commissioner's hearing, plaintiff's injuries continued to cause him numbness, tingling and pain in his left arm and neck when he turns his head left, looks up, or tilts his head left or back. The pain extends down his neck into the shoulder area and into his lower back. Plaintiff also has headaches, and his memory has diminished.
24. As the result of the compensable injury by accident, plaintiff sustained a herniated cervical disc and exacerbation of his pre-existing cervical degenerative disc disease and spinal stenosis.
25. As the result of the compensable injury by accident, plaintiff was disabled from any employment from March 31, 2000 until his return to work August 3, 2000. Thereafter, plaintiff was capable of some work within restrictions and after he left defendant's employment he made a reasonable but unsuccessful attempt to find employment from November 3, 2000 through June 10, 2001 when his unemployment benefits ended. The record contains no evidence that plaintiff engaged in a reasonable job search after June 11, 2001. Plaintiff returned to work for a different employer, Farmers Lawn and Garden in Roxboro, on April 3, 2002.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On March 17, 2000, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer, resulting in a herniated cervical disc and an exacerbation of his pre-existing cervical degenerative disc disease and spinal stenosis. N.C. Gen. Stat. § 97-2(6).
2. Defendant admitted the compensability of plaintiff's injury by accident on March 17, 2000 by filing a Form 60. However, the Form 60 does not create a presumption of continuing disability and therefore the burden of proving disability remains with plaintiff. Sims v.Charmes/Arby's Roast Beef, 142 N.C. App. 154, 542 S.E.2d 277 (2001).
3. In order to meet the burden of proving disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v. PerdueFarms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. LowesProduct Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993) (citations omitted). When a plaintiff meets his burden of showing disability, the burden then shifts to defendant to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms, Inc., supra.
4. In the instant case, plaintiff met his initial burden to show that he was disabled. Plaintiff was unable due to his compensable injury to return to his regular job or to any other employment from March 31, 2000 until August 2, 2000 when he returned to work for defendant-employer. From August 3, 2000 until November 3, 2000 plaintiff worked at reduced wages. However, the greater weight of the evidence showed that the warehouse job at defendant-employer was not suitable employment and therefore plaintiff's resignation and constructive refusal to accept this employment was justified. N.C. Gen. Stat. § 97-32.
5. From November 4, 2000 through June 10, 2001 plaintiff was capable of some work but after a reasonable job search was unable to find employment. After plaintiff's unemployment benefits ended, the greater weight of the evidence fails to show that plaintiff was disabled. After June 11, 2001 plaintiff has not met his burden to show that he was unable to obtain employment after a reasonable effort or that it was futile for him to seek employment because of other factors. He was capable of some work and no doctor took him out of work. N.C. Gen. Stat. § 97-2(9);Russell v. Lowes Product Distribution, supra.
6. As a result of the injury by accident of March 17, 2000, plaintiff was temporarily totally disabled from work from March 31, 2000 to August 2, 2000, and from November 4, 2000 until June 10, 2001, and he is entitled to temporary total disability compensation for the same time periods at the rate of $307.91 per week. N.C. Gen. Stat. § 97-29. Defendant is entitled to a credit for any temporary total disability compensation already paid to plaintiff during this period and to a deduction for unemployment benefits received by plaintiff. N.C. Gen. Stat. § 97-42.1.
7. As a result of the injury by accident on March 17, 2000 plaintiff was temporarily partially disabled from work from March 31, 2000 through August 2, 2000 and was entitled to payment of temporary partial disability compensation, which amounts have already been paid by defendant. N.C. Gen. Stat. § 97-30.
8. As a result of the injury by accident of March 17, 2000, plaintiff sustained a 15% permanent partial impairment to his spine, for which he is entitled to payment of permanent partial disability compensation for 45 weeks at the rate of $307.91 per week. N.C. Gen. Stat. § 97-31(23).
9. As a result of the injury by accident on March 17, 2000, plaintiff is entitled to payment by defendant of medical treatment incurred or to be incurred for his resulting injuries. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay plaintiff temporary total disability compensation from March 31, 2000 to August 2, 2000, and from November 4, 2000 until June 10, 2001 at the rate of $307.91 per week. This amount has accrued and shall be paid in a lump sum, subject to an attorney's fee approved below, a credit for compensation already paid plaintiff for this period of time, and a deduction for unemployment benefits received by plaintiff.
2. Subject to attorney's fees approved below, defendant shall pay to plaintiff permanent partial disability compensation for 45 weeks at the rate of $307.91 per week for his 15% permanent partial disability to the spine. This amount has accrued and shall be paid in a lump sum.
3. Defendant shall pay all medical expenses incurred or to be incurred by plaintiff that are causally related to his compensable injury and that are necessary to effect a cure, provide relief, and/or lessen his period of disability.
4. A reasonable attorney's fee of 25% of the sums due plaintiff in Paragraphs 1 and 2 of this AWARD is approved for plaintiff's counsel and shall be deducted from said sums and paid directly to plaintiff's counsel.
5. Defendant shall pay the costs.
This the 16th day of March 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_____________ PAMELA T. YOUNG COMMISSIONER